BAKER v GENERAL MOTORS CORPORATION
COLLIER v GENERAL MOTORS CORPORATION
SEIDELL v GENERAL MOTORS CORPORATION

1. STATUTES—CONSTRUCTION—MICHIGAN EMPLOYMENT SECURITY ACT
   —REGULAR UNION DUES.

   The express mention of one thing in a statute implies the exclu-
   sion of other similar things; therefore, in excluding the pay-
   ment of "regular" union dues from the benefits disqualification
   provision of the Michigan Employment Security Act, the Legis-
   lature left every type of union assessment other than "regular"
   union dues as part of the disqualification provision (MCLA
   421.29; MSA 17.531).

2. STATUTES—CONSTRUCTION—MICHIGAN EMPLOYMENT SECURITY ACT
   —DISQUALIFICATION FOR BENEFITS—REGULAR UNION DUES.

   The addition of the qualifying language, "in amounts and for
   purposes established prior to the inception of such labor dis-
   pute", in the benefits disqualification provision of the Michigan
   Employment Security Act is intended to limit rather than
   expand the scope of the exception allowed for the payment of
   "regular" union dues (MCLA 421.29; MSA 17.531).

3. UNEMPLOYMENT COMPENSATION—LABOR RELATIONS—PAYMENTS TO
   UNION—DIRECT INVOLVEMENT TEST—MICHIGAN EMPLOYMENT
   SECURITY ACT—STATUTES.

   Payments to a union which support a strike evade the direct
   involvement test in the benefits disqualification section of the
   Michigan Employment Security Act only if they are both, (1)
   regular, and (2) in amounts and for purposes established prior
   to the inception of the labor dispute causing the strike (MCLA
   421.29; MSA 17.531).

4. STATUTES—CONSTRUCTION.

   In the construction of a statute every word should be given

REFERENCES FOR POINTS IN HEADNOTES
[1, 2, 4, 6] 73 Am Jur 2d, Statutes § 194 *et seq.*
[3] 76 Am Jur 2d, Unemployment Compensation § 85.
[5] 76 Am Jur 2d, Unemployment Conpensation § 5.

meaning and no word should be treated as surplusage or rendered nugatory if at all possible.

5. UNEMPLOYMENT COMPENSATION—MICHIGAN EMPLOYMENT SECURITY ACT—INTENT—CONSTRUCTION—STATUTES.

The Michigan Employment Security Act is intended to provide relief from the hardships caused by involuntary unemployment; the act, being remedial, must be construed liberally to achieve its purpose, and conversely, the disqualification provisions are to be read narrowly (MCLA 421.1 *et seq.;* MSA 17.501 *et seq.).*

6. STATUTES—CONSTRUCTION—LEGISLATIVE INTENT.

Courts must interpret words according to their ordinary usage and in the sense in which they are understood and employed in common language in exercising the judicial function of determining legislative intent.

Appeals from Genesee, Thomas C. Yeotis, J., Wayne, James N. Canham, J., and Ingham, James T. Kallman, J. Submitted December 13, 1976, at Detroit. (Docket Nos. 24083, 24084, 24150.) Decided March 28, 1977. Leave to appeal applied for.

Claims for unemployment compensation by A. G. Baker, Jr., Kenneth R. Collier, Robert J. Seidell, and others, against General Motors Corporation and the Michigan Employment Security Commission. The commission approved the claims. General Motors appealed to a hearing referee who reversed the commission's decisions. The Michigan Employment Security Appeal Board upheld the referee's determination. Plaintiffs Baker and others appealed to the Genesee County Circuit Court. Plaintiffs Collier and others appealed to the Wayne County Circuit Court. Plaintiffs Seidell and others appealed to the Ingham County Circuit Court. The Genesee and Wayne County Circuit Courts reversed and found for the plaintiffs. The Ingham County Circuit Court affirmed and found for the defendant. General Motors appeals from the judgments of the Genesee and Wayne County

Circuit Courts by leave granted. Plaintiffs Seidell and others appeal from the judgment of the Ingham County Circuit Court by leave granted. Cases consolidated on appeal. The Ingham County judgment is affirmed. The Genesee and Wayne County judgments are reversed.

*John A. Fillion, Jordan Rossen* and *Anne M. Trebilcock (Edwin G. Fabré, Ralph O. Jones, Leonard R. Page, Marley S. Weiss* and *M. Jay Whitman,* of counsel), for plaintiffs.

*J. R. Wheatley,* for General Motors Corporation.

*Edward J. Setlock,* for the Michigan Employment Security Commission.

Before: T. M. BURNS, P. J., and M. J. KELLY and D. F. WALSH, JJ.

D. F. WALSH, J. In the cases of *Baker v General Motors Corp* and *Collier v General Motors Corp,* Nos. 24083 and 24084, the company applied for leave to appeal from judgments of the Genesee and Wayne County Circuit Courts, respectively, which held that the plaintiffs were entitled to unemployment compensation. In *Seidell v General Motors Corp,* No. 24150, the plaintiffs applied for leave to appeal from a judgment of the Ingham County Circuit Court which held that plaintiffs were disqualified for such benefits. By orders dated January 21, 1976, we granted the parties' applications for leave to appeal and consolidated the cases for review.

The facts are essentially undisputed. On September 6, 1967, at 11:59 p.m. the 1964 national agreement between General Motors and the Interna-

tional Union, United Automobile, Aerospace and Agricultural Implement Workers of America (hereinafter the "International") expired, as did agreements between individual company plants and union locals. In June 1967 the International notified GM of its intention to terminate the national and local agreements. On July 10, 1967, the International and the company commenced negotiations on the national agreement. During the week of August 27, a vote was taken of the UAW membership and strikes were authorized, if necessary, on national and local issues. Negotiations continued beyond the expiration date of the existing agreements until December 15, 1967, when a contract settlement was reached. As part of the settlement, the company agreed to waive the provision of the national agreement prohibiting a strike with respect to those plants at which the International authorized a strike over local issues, provided the company was notified five working days in advance of the union's intention to strike. The agreement was ratified on December 28, 1967. Union members continued in their employment during the course of negotiations on a new national contract.

On January 10, 1968, pursuant to the agreement, the International gave the company 10 days notice of its intention to authorize strikes at five Michigan plants and five out-of-state plants. These authorizations were based upon the strike vote taken in August. Later that month strikes occurred at foundries in Saginaw, Michigan; Defiance, Ohio; and Tonawanda, New York.[1] Following the strikes, the plants employing the UAW members

[1] The Chevrolet-Flint Manufacturing and the Chevrolet V-8 Engine Plants in this state, as well as assembly plants at Framingham, Massachusetts; Lordstown, Ohio; Van Nuys, California; and Atlanta, Georgia, were also struck.

involved in these lawsuits experienced shutdowns or curtailments of production and the members became unemployed.

Union members filed for unemployment compensation which claims were approved by the Michigan Employment Security Commission upon redetermination. The company appealed to a hearing referee who reversed the commission's decision. The referee found that the claimants were disqualified under § 29(8)(a)(II) of the Michigan Employment Security Act, MCLA 421.1 *et seq.;* MSA 17.501 *et seq.,* because they had financed the labor dispute which caused their unemployment. The Michigan Employment Security Appeal Board upheld the referee's determination which decision in turn, was affirmed by the Ingham County Circuit Court and overturned by the circuit courts of Genesee and Wayne Counties.

At issue in the instant case is the construction and application of MESA § 29(8)(a)(II). At the time of claimants unemployment that section provided:

"(8) An individual shall be disqualified for benefits for any week with respect to which his total or partial unemployment is due to a labor dispute in active progress, or to shutdown or start-up operations caused by such labor dispute, in the establishment in which he is or was last employed, or to a labor dispute (other than a lockout) in active progress, or to shutdown or start-up operations caused by such labor dispute, in any other establishment within the United States which is functionally integrated with such establishment and is operated by the same employing unit. No individual shall be disqualified under this subsection 29(8) if he is not directly involved in such dispute.

"(a) For the purposes of this subsection 29(8), no individual shall be deemed to be directly involved in a labor dispute unless it is established that:

\*   \*   \*

"(II) He is participating in or financing or directly interested in the labor dispute which causes his total or partial unemployment. The payment of regular union dues (in amounts and for purposes established prior to the inception of such labor dispute) shall not be construed as financing a labor dispute within the meaning of this subparagraph * * * ." MCLA 421.29(8)(a)(II); MSA 17.531(8)(a)(II).

The 1964 constitution of the International provided for regular monthly membership dues of $5 of which $3.75 was allocated to the union administrative fund and $1.25 to the union strike fund. On October 8, 1967, while a strike was in progress at Ford Motor Company, the International held a special convention in Detroit, one of the major purposes of which was amendment of the dues structure. The convention amended article 16 of International's constitution to provide for "emergency dues" commencing with October 8, 1967, and continuing "during the current collective bargaining emergency as determined by the International executive board and thereafter, if necessary, until the International union strike fund has reached the sum of twenty-five million dollars ($25,000,000) * * * ". During the emergency, administrative dues consisted of $3.75 per month and strike fund dues consisted of $11.25 or $21.25 per month depending upon the average hourly wage at the member's plant. After termination of the emergency or achievement of the $25,000,000 goal, union dues were to consist of two hours straight-time per month. The local union was to get 40% of the dues and the remaining 60% was to be divided evenly between the administrative and strike funds of the International.

At the hearing before the referee, counsel stipulated that: (1) the claimants had paid emergency

dues for October and November, (2) that the dues allocated by the constitutional amendment to the strike insurance fund were remitted by the local unions and placed by the International in the strike fund, and (3) UAW members on strike at the three foundries were paid benefits from the International's strike insurance fund.

The hearing referee found that the claimant's unemployment was the result of a labor dispute in active progress at functionally integrated plants. While the referee found that the claimants did not participate in the labor dispute and were not directly interested, he did hold that the claimants financed the dispute by the payment of the dues set by the UAW convention of October 8. The referee defined "regular union dues" as dues the amount and purposes of which were set prior to inception of a labor dispute: he found that the labor dispute in the present case had its inception after termination of local agreements and negotiations of future terms, since a controversy then existed.

The appeal board agreed with the referee as to the cause of plaintiffs' unemployment, the functional integration of the plants at which the strikes occurred with those at which plaintiffs were employed, and the fact that plaintiffs neither participated in nor were directly interested in such disputes. The board also upheld the referee's determination that plaintiffs had financed the labor dispute causing their unemployment, on a different basis however. The board found that the dues established by the convention were neither regular nor were they set in purposes and amounts prior to inception of the labor dispute, which the board found had commenced in June, 1967.

On appeal, the Ingham County Circuit Court

held that the appeal board's decision regarding plaintiffs' direct involvement in the labor dispute was a factual question. As the court found the board's determination supported by the record, it refused to substitute its judgment for that of the board. The Genesee County Circuit Court found that as the emergency dues were paid prior to the strikes which resulted in claimants' unemployment, their payment did not constitute financing a labor dispute. The court held that "a labor dispute in active progress" should not be so broadly construed as to include good faith bargaining prior to an impasse. The Wayne County Circuit Court held that claimants had not financed the dispute as the 1967 Ford strike was not functionally integrated with the 1968 General Motors strikes, the General Motors strikes were not contemplated at the time the special dues were paid, and the dues were used only to revitalize the strike fund during the Ford strike. The court also refused to disqualify claimants on the basis that their unemployment was not caused solely by the labor dispute. The court found that other factors, consisting of seniority provisions in local collective bargaining agreements and General Motors' failure to buy parts on the open market, also contributed.

On appeal, General Motors attacks the decision of the Genesee County and Wayne County Circuit Courts as violative of the purpose of the MESA to provide relief from unemployment in a manner which avoids encouraging work stoppages. Seeking reversal of the Ingham County Circuit Court decision, claimants primarily contend that the dues paid in the instant case did not constitute financing the labor dispute as a matter of law.[2]

---

[2] Plaintiffs also argue that the Ingham County Circuit Court unduly restricted its review of the appeal board's decision. We agree.

An appeal board determination is reviewable for questions of law or

The disqualifying provision[3] under consideration originally provided simply that one "participating in or financing or directly interested in the labor dispute which caused the stoppage of work" was directly involved in the dispute. 1936 PA Ex Sess 1. By 1937 PA 347, the Legislature added: *"Pro-*

---

fact: it may only be reversed if contrary to the law or unsupported by competent, material and substantial evidence on the whole record. Const 1963, art 6, § 28, MCLA 421.38; MSA 17.540. Where no dispute exists as to the underlying facts, the question presented is one of proper application of the law. *Thomas v Employment Security Commission,* 356 Mich 665; 97 NW2d 784 (1959), *Graham v Fred Sanders Co,* 11 Mich App 361; 161 NW2d 601 (1968). In the instant case, therefore, the board's determination that claimants were directly interested in the labor dispute causing their unemployment was reviewable as a question of law.

[3] Generally, before discussing whether an individual is directly involved in a labor dispute so as to be disqualified for benefits, the basic provision of § 29(8) must be applied, that is, it must first be determined, in the present case, whether claimants' unemployment was due to a labor dispute in active progress at a functionally integrated plant. *Park v Employment Security Commission,* 355 Mich 103; 94 NW2d 407 (1959), *Scott v Budd Co,* 380 Mich 29; 155 NW2d 161 (1968). Claimants do not challenge the finding made by the hearing referee and appeal board that the struck plants were functionally integrated with the plants at which they were employed. They do, however, argue that their unemployment was not the result of such labor disputes but was caused by General Motors management decisions and seniority provisions in local collective bargaining agreements which determined the order of layoff. In this regard, claimants would have this Court adopt the opinion of the Wayne County Circuit Court.

In order for a claimant to be disqualified from receiving unemployment benefits because of a labor dispute, a causal connection between the dispute and the claimant's unemployment must be established. *Scott v Budd Co, supra.* An employer seeking exemption from payment of unemployment benefits on the ground that the unemployment was due to a labor dispute in active progress bears the burden of proving it is entitled to such an exception. *Salenius v Employment Security Commission,* 33 Mich App 228; 189 NW2d 764 (1971). The issue is one of fact. *Bedwell v Employment Security Commission,* 367 Mich 415; 116 NW2d 920 (1962). *See, Scott v Budd Co, supra, Michigan Tool Co v Employment Security Commission,* 346 Mich 673; 78 NW2d 571 (1956). In the present case, the appeal board's finding that claimants' unemployment was due to a labor dispute in active progress at a functionally integrated plant is supported by competent, material, and substantial evidence on the whole record. MCLA 421.38; MSA 17.540. That being the case, the board's finding is conclusive upon the circuit court and this Court.

*vided, however,* That the payment of *regular* union dues shall not be construed as financing a labor dispute * * * ". (Emphasis added.) The parenthetical phrase "in amounts and for purposes established prior to the inception of such labor dispute" which is presently contained in the statute was added by 1963 PA 226.

In excluding the payment of *"regular"* union dues from the § 29(8) disqualification in 1937, the Legislature left within the terms of the section every type of union assessment other than *"regular"* union dues. The express mention of one thing in a statute implies the exclusion of other similar things. *Stowers v Wolodzko,* 386 Mich 119; 191 NW2d 355 (1971), *Citizens Mutual Insurance Co v Central National Insurance Co of Omaha,* 65 Mich App 349; 237 NW2d 322 (1975). Hence, extraordinary union dues still constituted financing a labor dispute if used for such purposes. The addition of the qualifying language in 1963 did not expand the scope of the exception: it further limited it. Presently, therefore, payments to a union which support a strike evade the direct involvement test of § 29(8) only if they were both: (1) regular, and (2) in amounts and for purposes established prior to the inception of the labor dispute. To adopt the conclusion that union dues do not constitute financing only if the amounts and purposes of such dues are established prior to the dispute would render the word "regular" meaningless. Every word in a statute should be given meaning and no word should be treated as surplusage or rendered nugatory if at all possible. *Stowers v Wolodzko, supra, Chrysler Corp v Washington,* 52 Mich App 229; 217 NW2d 66 (1974).[4]

_____

[4] The two-step approach which this Court adopts is further supported by the regulations of the Michigan Employment Security Commission implementing MESA § 29(8)(a)(II). 1964–65 AACS, R

The Michigan Employment Security Act is intended to provide relief from the hardship caused by involuntary unemployment. As the purpose of the act is remedial, it is to be liberally construed. MCLA 421.2; MSA 17.502, *Noblit v The Marmon Group,* 386 Mich 652; 194 NW2d 324 (1972), *Salenius v Employment Security Commission,* 33 Mich App 228; 189 NW2d 764 (1971). Conversely, the disqualification provisions of § 29 are to be read narrowly. *Salenius v Employment Security Commission, supra.* Nevertheless,

"All interested parties who are involved in a claim for unemployment compensation * * * must be dealt with on an impartial basis. The unemployment compensation fund should never be used to finance claimants who are directly involved in a labor dispute, nor should it ever be denied to claimants who are legally entitled to receive benefits. * * * None of the money accumulated in this fund should ever be disbursed for the purpose of financing a labor dispute nor should it be illegally withheld for the purpose of enabling an employer to break a strike. The State of Michigan, in so far as this act is concerned, must remain neutral in all industrial controversies." *Lawrence Baking Co v Unemployment Compensation Commission,* 308 Mich 198, 213; 13 NW2d 260, 265; 154 ALR 660, 669 (1944), *cert den,* 323 US 738; 65 S Ct 43; 89 L Ed 591 (1944).

If every assessment made "for purposes established prior to the inception of [a] labor dispute" were to be considered "regular" dues as that term is used in § 29(8)(a)(II), special assessments could be levied on all members of an international union for the express purpose of financing anticipated local strikes without affecting the right of non-

421.251(4). *See, Magreta v Ambassador Steel Co,* 380 Mich 513; 158 NW2d 473 (1968).

striking contributors to receive unemployment benefits should they become unemployed as a result of the local strike. Such an interpretation would destroy the state's neutrality in the controversy and abrogate the expressed purpose of the act to aid only those unemployed because of conditions over which they have no control.

In exercising the judicial function of determining legislative intent, courts must interpret words according to their ordinary usage and in the sense in which they are understood and employed in common language. *Chrysler Corp v Washington, supra.* Webster's New Collegiate Dictionary (1975), p 974, states that "regular" is synonymous with "normal", "typical" and "natural" to the extent that they all mean "being of the sort or kind that is expected as usual, ordinary, or average". The assessment made by the union against its members in October 1967 was not regular. According to the 1964 UAW constitution, minimum monthly union dues were $5, with $3.75 allocated to the union administrative fund and $1.25 to the strike insurance fund. Under the amendment of October 8, administrative dues remained the same. Dues allocated to the strike fund, however, were increased nine-fold. The amendment provided that the schedule was to remain in effect "during the current collective bargaining emergency" after which a reduced schedule would become effective. Clearly, the dues schedule adopted October 8 was intended to be only a temporary measure and cannot be termed regular, usual or ordinary.[5] Subsequent events support the temporary nature of the provision. Union members paid the increased dues only during October and November when the reduced schedule went into effect.[6]

---

[5] The Wayne County Circuit Court itself termed the dues "special".

[6] Because we find the dues assessed in the instant case extraordi-

By stipulation, claimants' counsel admitted that the emergency dues collected were used to subsidize the foundry workers on strike. We necessarily find, therefore, that claimants were directly involved in the labor dispute causing their unemployment, as defined by § 29(8)(a)(II), and are thus precluded from receiving benefits.[7]

Plaintiffs' remaining contentions are without merit.

The judgment of the Ingham County Circuit Court is affirmed; the judgments of the Genesee County and Wayne County Circuit Courts are reversed.

---

nary, we have no reason to decide when the labor dispute causing plaintiffs' unemployment had its inception.

[7] Our decision has no effect upon the ability of a union to designate a portion of its regular monthly dues as representing a contribution toward a strike insurance fund without disqualifying its members from unemployment compensation for financing a labor dispute in which they are in no other way directly involved. *Burrell v Ford Motor Co,* 386 Mich 486; 192 NW2d 207; 62 ALR3d 304 (1971).