830 F.2d 924
 126 L.R.R.M. (BNA) 2585, 56 USLW 2210,
107 Lab.Cas. P 10,164,
Unempl.Ins.Rep. CCH 21,869
 The UNITED STEELWORKERS OF AMERICA AFL-CIO-CLC, and United
Steelworkers of America, Local Union No. 7044, Appellees,
v.
Julie M. JOHNSON, in her capacity as Secretary of the South
Dakota Department of Labor, Appellant.
 No. 85-5101.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 12, 1987.
Decided Oct. 7, 1987.
 
 Wayne F. Gilbert, Rapid City, S.D., for appellant.
 John G. Engberg, Minneapolis, Minn., for appellees.
 Before LAY, Chief Judge, HEANEY, ROSS,* McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN and MAGILL, Circuit Judges, En Banc.
 FAGG, Circuit Judge.
 
 
 1
 The State of South Dakota appeals from the district court's order holding that the State's basis for denying unemployment compensation benefits to union claimants during the course of the labor dispute impermissibly conflicted with and was preempted by section 7 of the National Labor Relations Act (NLRA), 29 U.S.C. Sec. 157. See United Steelworkers v. Meierhenry, 608 F.Supp. 201, 208-09 (D.S.D.1985). A panel of this court affirmed. See United Steelworkers v. Johnson, 799 F.2d 402, 409-10 (8th Cir.1986). On rehearing en banc we also affirm.
 
 
 2
 The relevant facts are largely undisputed and may be briefly stated. In 1982 the United Steelworkers of America (Union) was the certified bargaining representative for the employees of Homestake Mining Company (Homestake), located in Lead, South Dakota. Because South Dakota was a right-to-work state, Homestake employees had no obligation to belong to the Union. See S.D. Const. art. VI, Sec. 2; S.D.Codified Laws Sec. 60-8-3 (1978). Those Homestake employees who chose not to join the Union worked alongside union employees and enjoyed the benefits of the Union-negotiated collective bargaining agreement. Nonunion employees paid no union dues and were not allowed to participate in union decisions.
 
 
 3
 On May 31, 1982, a three-year collective bargaining agreement between Homestake and the Union expired. At a union meeting held that same day a majority of Homestake's union employees voted to strike. In response, Homestake closed down all operations and refused entry to all employees, union and nonunion alike, who attempted to go to work.
 
 
 4
 As the dispute deepened, both union and nonunion employees applied for unemployment compensation benefits. Initially, the South Dakota Department of Labor (Department) denied all claims for benefits made by Homestake employees. The denials flowed from the language of section 61-6-19 of the South Dakota Codified Laws. This statute provides that no benefits will be paid to any employee whose "unemployment is due to a stoppage of work which exists because of a labor dispute at the * * * establishment * * * at which [the employee] is or was last employed." S.D. Codified Laws Sec. 61-6-19 (1978). Homestake employees, union and nonunion alike, were unemployed as a direct result of a labor dispute. Thus, the employees fell within the general prohibition against benefits contained in section 61-6-19.
 
 
 5
 Both union and nonunion claimants appealed. In analyzing their claims, the chief appeals referee for the Department found inapplicable two of the three exceptions to the general prohibition contained in section 61-6-19. These exceptions remove an employee from the general prohibition if
 
 
 6
 (1) [The employee] is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work; and
 
 
 7
 (2) [The employee] does not belong to a grade or class of workers of which, immediately before the commencement of the stoppage, there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute.
 
 
 8
 Id. Sec. 61-6-19(1), (2).
 
 
 9
 Under the circumstances of this case, the referee concluded that all claimants were either participating in, financing, or directly interested in the labor dispute and were of the same grade or class of workers involved in the labor dispute. See id. Thus, the union and nonunion claimants could not come under the first two exceptions to section 61-6-19. Neither party to this appeal challenges the referee's determination concerning the inapplicability of these exceptions.
 
 
 10
 Seizing on the third and final exception to the general prohibition of section 61-6-19, the referee found that nonunion claimants had been "locked out" of their employment by Homestake. See id. Sec. 61-6-19(3). The referee wrote:
 
 
 11
 The claimants do not belong to the union that is involved in the labor dispute. * * * [T]he claimants have been available for work with the employer since the labor dispute commenced, but the employer has declined to allow them to commence work. In view of this circumstance, the claimants would, in effect, be locked out from their employment by the employer.
 
 
 12
 (Emphasis added.) Because nonunion employees were available for work but were prevented from working by Homestake, the referee determined those employees were locked out and thus were eligible to receive unemployment benefits under section 61-6-19(3).
 
 
 13
 Under the same statutory exception, however, the referee denied benefits to all union claimants. Focusing his decision on the employees' union membership, the referee concluded union claimants were not locked out within the meaning of section 61-6-19(3). He wrote:
 
 
 14
 Some claimants might be willing to cross a picket line to resume work for the employer and feel that since the mine is shut down they are locked out from employment [by] the employer. However, the claimants do belong to Local 7044 of the United Steelworkers of America union whose membership did vote to go on strike against the employer. As members of the union which went on strike against the employer, the claimants would have initiated the labor dispute prior to any employment being withheld by the employer. Consequently, it cannot be said that the claimants are locked out by the employer.
 
 
 15
 (Emphasis added.)
 
 
 16
 The referee made no attempt to identify or distinguish those union employees who were willing to work despite the strike from those union employees who were unwilling to work because of the strike. Rather, all union employees as a class were denied benefits based on their union membership. More to the point, in sharp contrast with nonunion claimants, the referee made no inquiry and treated as irrelevant any consideration of whether individual union claimants were available to work despite the position taken by the Union as a whole.
 
 
 17
 The South Dakota Secretary of Labor affirmed on appeal, again relying only on section 61-6-19(3). In the wake of these rulings, a number of union employees attempted to resign from the Union in an effort to become eligible for unemployment benefits. See Pattern Makers' League v. NLRB, 473 U.S. 95, 105 S.Ct. 3064, 87 L.Ed.2d 68 (1985) (union members have the right to resign from a union at any time and avoid imposition of union discipline).
 
 
 18
 The Union then filed this lawsuit in federal district court. Among other contentions, the Union asserted South Dakota was prohibited under section 7 of the NLRA from denying unemployment benefits to union claimants based on their membership in the union.
 
 
 19
 The district court agreed and concluded South Dakota's application of the lockout exception contained in section 61-6-19(3) impermissibly conflicted with section 7 of the NLRA. As a result, the district court enjoined South Dakota from construing section 61-6-19(3) "to allow the payment of unemployment compensation benefits to non-union employees idled by a strike while the same grade or class of employees who are members of a union are denied unemployment benefits based upon their membership in a union." Meierhenry, 608 F.Supp. at 209.
 
 
 20
 At the core of this case is the potential conflict between an employee's federally protected rights under section 7 and a state's strong interest in implementing an unemployment compensation plan consistent with the needs of its citizens. The potential for conflict was created during the summer of 1935 when, within a span of five weeks, Congress enacted two significant pieces of legislation. The first piece of legislation was the National Labor Relations Act, ch. 372, 49 Stat. 449 (1935). The second was the Social Security Act, ch. 531, 49 Stat. 620 (1935).
 
 
 21
 In adopting the NLRA, Congress specifically recognized and guaranteed to all workers the rights of free association and self-organization. 49 Stat. at 449-50, 452. As amended, section 7 of the NLRA, in broad uncompromising language, provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection * * *." 29 U.S.C. Sec. 157. In equally clear language, however, section 7 provides that employees in right-to-work states like South Dakota "shall also have the right to refrain from any or all [union] activities." Id.; see id. Sec. 164(b). The exercise of these federally sanctioned rights in right-to-work states naturally leads to situations in which union and nonunion employees work together as part of the same company.
 
 
 22
 As indicated, Congress also enacted the Social Security Act in the summer of 1935. Title IX of that Act was created to provide a "valuable first line of defense" against the problem of unemployment. Report of the Committee on Economic Security, H.R.Doc. No. 81, 74th Cong., 1st Sess. 11 (1935) (hereinafter Report ); see also id. at 3. Specifically, Title IX established an extensive federal-state cooperative system under which state-based unemployment compensation programs now operate. See 49 Stat. at 639-45; Report, supra, at 13, 16; see also New York Tel. Co. v. New York State Dep't of Labor, 440 U.S. 519, 536 & n. 27, 99 S.Ct. 1328, 1339 & n. 27, 59 L.Ed.2d 553 (1979) (plurality). Under the framework of Title IX, while certain federal requirements must be met, each state is free to develop a compensation plan to fit the needs of its particular citizens. As the Supreme Court noted in New York Telephone Co., "[t]he voluminous history of the Social Security Act ma[kes] it abundantly clear Congress intended the several States to have broad freedom in setting up the types of unemployment compensation that they wish." 440 U.S. at 537, 99 S.Ct. at 1339 (plurality); see Report, supra, at 16. This freedom includes the State's right to establish eligibility criteria. New York Tel. Co., 440 U.S. at 539, 99 S.Ct. at 1340 (plurality).
 
 
 23
 Returning to the appeal before us, we recognize that section 61-6-19 is part of South Dakota's statutory scheme to develop and implement an unemployment compensation plan under the federal-state cooperative system established by Title IX. The Union makes no claim section 61-6-19 is inconsistent with Title IX. Further, the Union does not contend that the State was prohibited from generally denying benefits to all employees idled by a labor dispute or, having done so, that the State was obligated to adopt a lockout exception to this general rule. Rather, the Union asserts the State cannot adopt a lockout exception and then apply the exception in a way that destroys the balanced focus of section 7 and impermissibly burdens an employee's federally protected right to belong to a union.
 
 
 24
 In response, South Dakota argues its denial of benefits under section 61-6-19(3) was based on the federally approved distinction between voluntary and involuntary unemployment. It contends any impact on section 7 rights was purely incidental and should not trigger preemption. The State points out that nonunion employees claiming unemployment benefits had no voice in the decision to strike. Further, those employees were able and willing to work, but were refused entry by Homestake. In the State's view, those employees were involuntarily unemployed and thus were locked out within the meaning of section 61-6-19(3).
 
 
 25
 The State argues that in contrast union employees had an opportunity to participate in the strike vote. Because union employees had this opportunity, the State contends they were responsible for their own unemployment and could not be locked out under the South Dakota statute. In other words, regardless whether individual union members were willing to work despite the position taken by the Union as a whole, they were deemed voluntarily, rather than involuntarily, unemployed.
 
 
 26
 As an initial matter, we agree with the State that an unemployment compensation decision can be based on a determination of whether the individual claimant is voluntarily or involuntarily unemployed. An important goal of Title IX is to ease the economic hardships caused by unwanted unemployment. The legislative history of Title IX refers to involuntary rather than voluntary unemployment as a key to eligibility. Report, supra, at 18 ("To serve its purposes, unemployment compensation must be paid only to workers involuntarily unemployed. The employees compensated must be both able and willing to work * * *."); see also Wimberly v. Labor & Indus. Relations Comm'n, --- U.S. ----, 107 S.Ct. 821, 824, 93 L.Ed.2d 909 (1987) ("[A]ll States require claimants to be 'eligible' for benefits, that is, they must be able to work and available for work."); Report, supra, at 9. In certain circumstances states may decide to provide unemployment compensation benefits to voluntarily unemployed workers, see New York Tel. Co., 440 U.S. at 540, 544, 547, 99 S.Ct. at 1341, 1343, 1344, or not to provide benefits to involuntarily unemployed workers, see Ohio Bureau of Employment Servs. v. Hodory, 431 U.S. 471, 483, 97 S.Ct. 1898, 1905, 52 L.Ed.2d 513 (1977). Nevertheless, "[t]he involuntary character of the unemployment [will] * * * generally [be] a necessary condition to eligibility for compensation." Baker v. General Motors Corp., --- U.S. ----, 106 S.Ct. 3129, 3136, 92 L.Ed.2d 504 (1986).
 
 
 27
 Under the statutory scheme before us, the general prohibition and first two exceptions of section 61-6-19 undergird South Dakota's decision generally to deny benefits to union and nonunion employees who are meaningfully connected to a labor dispute. As interpreted by the State in this instance, however, the final exception to section 61-6-19 provides unemployment compensation benefits to those employees who, despite an existing labor dispute, would still work if the employer had remained open. Essentially, South Dakota has made a policy determination to treat those workers as involuntarily unemployed. We express no opinion on the wisdom of this policy. For our purposes, it is sufficient that South Dakota's interpretation falls within the "wide range of judgment [that] is given to the several states as to the particular type of statute to be spread upon their books." Steward Mach. Co. v. Davis, 301 U.S. 548, 593, 57 S.Ct. 883, 893, 81 L.Ed. 1279 (1937).
 
 
 28
 In terms of implementing this policy, we have no quarrel with South Dakota's decision to use an able and willing to work test as its eligibility standard under section 61-6-19(3). This test is neutral on its face, makes no distinction between the classes of workers protected by section 7, and is reasonably related to determining the involuntary or voluntary nature of each worker's unemployment. In the circumstances of this case, however, South Dakota has failed to apply this test in a neutral, nondiscriminatory manner. See Wimberly, 107 S.Ct. at 825.
 
 
 29
 The record shows that in determining a union worker's eligibility for benefits South Dakota focused on whether the claimant belonged to the Union. While the State granted benefits to nonunion employees under section 61-6-19(3) based on the determination those employees were able and willing to work despite the strike, the State did not apply the able and willing to work test in reviewing the union employees' claims. Although South Dakota acknowledged that some union employees might be willing to work despite the existing labor dispute, it summarily concluded all union claimants were ineligible for benefits.
 
 
 30
 The State's focus on union membership is irrelevant to the eligibility standard articulated by the referee in his resolution of the appeals by nonunion claimants. Further, South Dakota's skewed application of its facially neutral test for identifying workers who are involuntarily unemployed interferes with the congressional objective of protecting equally those who choose to participate and those who choose not to participate in organized labor. The disparate treatment of union workers who may otherwise satisfy the eligibility standard significantly burdens the section 7 right to participate in organized labor. This conflict between federal and state law must be resolved in favor of federal law. See Brown v. Hotel & Restaurant Employees Int'l Union Local 54, 468 U.S. 491, 501, 104 S.Ct. 3179, 3185, 82 L.Ed.2d 373 (1984). At bottom, because South Dakota failed to apply its eligibility standard in a neutral manner, we reject the State's denial of benefits to union claimants as a class.
 
 
 31
 Nevertheless, we recognize that South Dakota retains the right in individual cases to determine whether benefits should be awarded under its controlling standard. Because no individual claimants are before us, we need not decide the correct outcome of any individual cases. We hold only that in the circumstances of this case South Dakota was prohibited by section 7 of the NLRA from not applying its neutral eligibility standard to union employees while applying that standard to nonunion employees.
 
 
 32
 Because the district court may be affirmed on this ground, we need not consider the Union's alternate assertion that its membership's first amendment rights have been violated.
 
 
 33
 Accordingly, we affirm.
 
 
 34
 MAGILL, Circuit Judge, with whom John R. GIBSON and WOLLMAN, Circuit Judges, join, dissenting.
 
 
 35
 Because I believe the court has erred in two important respects, I am compelled to dissent. First, the court concludes that the state denied benefits to "all union employees as a class * * * based on their union membership." Op. at 926 (emphasis added). I believe the record clearly shows, however, that South Dakota determined eligibility for unemployment compensation benefits based on whether a Homestake employee was voluntarily or involuntarily unemployed. By failing to give sufficient weight to key parts of the record, the court misinterprets the state's clearly stated rationale for awarding benefits. In so doing, the court also contravenes Supreme Court precedent expressly approving state unemployment compensation statutes which base eligibility on an employee's status as voluntarily or involuntarily unemployed. Second, in formulating its own erroneous standard for eligibility under the South Dakota statute, the court fails to consider the basic principle of labor law that the duly-elected union speaks for all its members, and instead, substitutes a rule giving union members the freedom to decide, in any given instance, whether they wish to be bound by or act in disregard of the legitimate decisions of their elected representative.
 
 
 36
 I. INVOLUNTARY/VOLUNTARY DISTINCTION AS BASIS OF SOUTH DAKOTA'S DETERMINATION OF BENEFITS.
 
 
 37
 The court concedes "that an unemployment compensation decision can be based on a determination of whether the individual claimant is voluntarily or involuntarily unemployed." Op. at 928. Nevertheless, the court concludes that South Dakota denied union members benefits based on their union membership: "The record shows that in determining a union worker's eligibility for benefits South Dakota focused on whether the claimant belonged to the Union." Op. at 929 (emphasis added).[1]
 
 
 38
 In fact, the record does not show that the state denied benefits based on union membership. In concluding otherwise, the court failed to analyze and discuss the decision of the Secretary of the South Dakota Department of Labor affirming the referee's decisions.[2] In so doing, the court reaches a result unsupportable in both fact and law.
 
 
 39
 First, I believe the record makes clear that South Dakota did not deny benefits based on union membership, but rather, denied benefits based on the voluntary decision of union members to strike. In quoting the referee's decision, the court emphasizes the following: "As members of the union which went on strike against the employer, * * * it cannot be said that the claimants are locked out by the employer." Op. at 926. The proper emphasis, however, and the emphasis which I believe the referee had in mind, is: "As members of the union which went on strike against the employer, * * * it cannot be said that the claimants are locked out by the employer." In other words, the referee did not, as the court mistakenly assumes, focus upon membership in the union as determinative; rather, the referee concentrated on the voluntary action taken by the union on behalf of its members as the key to the state's denial of benefits. The referee correctly reasoned that the union members, by striking, took a stance of voluntary unemployment before any "lockout" occurred, and thus were not entitled to benefits.[3]
 
 
 40
 The decision of the Secretary of the South Dakota Department of Labor, in affirming the referee's ruling, explicitly supports this interpretation.[4] In her opinion, the Secretary noted that the United States District Court of South Dakota, in United Steelworkers of America v. Block, 578 F.Supp. 1417 (D.S.D.1982), had recently addressed similar issues as they applied to a USDA regulation denying food stamps to strikers. The Secretary noted that Block involved the same Homestake strike and factual circumstances as in her ruling. In a deposition, the Secretary stated that she had relied upon the reasoning in Block because "[t]he circumstances were so close to this particular case that I used it as precedent."
 
 
 41
 The Secretary recognized that her ruling centered on 61-6-19(3), the "lockout" exception to denial of benefits, but that South Dakota law had not defined the term "lockout." She then quoted from Block, where the district court upheld the USDA's decision that non-union workers were "locked out" and thus entitled to food stamps: "Where an employer ceases operations at the place of employment immediately after a strike is called, and non-union workers are not obligated to honor the strike, the direct cause of the unemployment of non-union workers is the closure of the work place." In re United Steelworkers, Declaratory Ruling No. 82-1, S.D. Department of Labor (Dec. 30, 1982) (quoting Block, 578 F.Supp. at 1423).
 
 
 42
 In approvingly quoting this statement from Block, the Secretary clearly expresses the state's view that it awarded benefits to non-union members in this case not because of their non-membership status, but because their unemployment was totally involuntary. Non-union employees had no say in and were not bound by the strike, and thus, could have continued to work at the mine. It was only because the mine then closed that they became unemployed; the mine closure caused their unemployment.
 
 
 43
 On the other hand, the Secretary recognized that union members were rendered ineligible for food stamps in Block because they participated in the strike leading up to the mine closure. The Secretary expressly stated that the Block decision:
 
 
 44
 reinforces the [South Dakota] Department of Labor's prior rulings. "As a member of the union which went on strike against the employer, the claimant would have been part of the group which initiated the labor dispute prior to any employment being withheld by the employer." In the Matter of Leon Stalder, No. 25079, S.D. Dept. of Labor, Unemployment Ins. Div. (Sept. 9, 1982).
 
 
 45
 In re United Steelworkers, Declaratory Ruling No. 82-1.
 
 
 46
 Here the Secretary makes abundantly clear that the state did not deny unemployment compensation benefits based on union membership. Rather, the Secretary explains that union members voluntarily caused their own unemployment by going on strike before the mine closed, in contrast to non-union workers who became involuntarily unemployed because of the mine closure. In her deposition taken on July 20, 1984, the Secretary stressed repeatedly that her decision was based on a voluntary/involuntary, rather than a union/non-union, distinction:
 
 
 47
 In determining the eligibility criterion that were used, when it came to the point of looking at the facts and determining how to interpret our unemployment insurance law to meet that particular circumstance one of the things that I think became very apparent was that we were not necessarily making a determination on eligibility based on union membership. The thing that made the determination is whether they were out of work through no fault of their own. We were held by the Supreme Court and by the unemployment insurance laws themselves that if they are out of work through no fault of their own, then the law is to be liberally construed in their favor. I think what is more the case here is that we have a group of people who had, according to the facts in the hearings, who had indicated that they were ready and willing to go to work, but were unable to because of the company having shutdown or locked them out.
 
 
 48
 Deposition of J. Meierhenry, July 20, 1984, at 37-38 (emphasis added).
 
 
 49
 I would not find that unusual [claimants were asked whether they were members of the union] since our law does not allow striking participants to receive unemployment benefits.
 
 
 50
 Id. at 39.
 
 
 51
 [Claimants who were union members were uniformly denied unemployment compensation benefits] because they were participating in the strike as union members. If they were striking, yes.
 
 
 52
 Id. (emphasis added).
 
 
 53
 [T]hat would be normal [question addressed to claimants whether or not they were members of the United Steelworkers Union] because one who is a member of a union that is on strike--that would be a question you would ask. If a union goes on strike it means everyone with the union.
 
 
 54
 Id. at 40 (emphasis added).
 
 
 55
 They [non-union members] were [granted unemployment compensation] in this case because if they went to work and they were unable to work due to no fault of their own [they were paid].
 
 
 56
 Id.
 
 
 57
 Well, the facts I guess I still have to repeat what I said prior to this time. The fact is that the decision was not made based upon union and non-union membership.
 
 
 58
 Id. at 42 (emphasis added).
 
 
 59
 To be sure, in this case the term "voluntary unemployment" equates to "union member." The sole reason for this, however, is not because the state intended such a result, but because of the unique facts of this case. The Secretary explicitly recognized this in again quoting from Block:
 
 
 60
 Defendants utilized the distinction of member and nonmember as a means of determining and identifying ineligible "strikers." The distinction was relevant solely because of the unique facts of the Homestake strike. When the strike was called--and all union members were undisputably on strike--the Mine immediately closed. Defendants concluded that nonmembers were not given the time or the opportunity to join the strike, and thereby voluntarily became unemployed, before they were involuntarily unemployed by the closure of the Mine. For this reason, defendants treated nonmembers as though they were "locked out" and, therefore, eligible for food stamps. Defendants did not restrict the right of any person to quit or to join the Union.
 
 
 61
 In re United Steelworkers, No. 82-1, (quoting Block, 578 F.Supp. at 1421) (emphasis added in part).
 
 
 62
 In summary, the Secretary's decision, which the court's opinion totally ignores, does not say that the state granted benefits to non-union workers based on their "availability" to work or denied benefits to union members based on their union membership. Rather, the Secretary's use of the language in Block[5] clearly establishes that the state granted benefits to non-union members because they were out of work through no fault of their own, i.e., involuntarily unemployed, and that union members were denied benefits because they caused their own unemployment by participating in the strike before any lockout occurred, i.e., voluntary unemployment. By ignoring the Secretary's decision, the court not only abrogated the state's right to set its own criteria for granting or denying unemployment benefits, thus going against the precise teachings of the Supreme Court, it also incorrectly concluded that the state's interpretation of the statute creates an impermissible conflict with the union's section 7 rights.
 
 
 63
 In New York Telephone Co. v. New York State Department of Labor, 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979), the Supreme Court examined a New York law which "simply authorized striking employees to receive unemployment benefits * * *." Id. at 529, 99 S.Ct. at 1335. In upholding the law against a challenge that it was preempted by the National Labor Relations Act, the plurality noted that "the general purport of the [Social Security] program is not to regulate the bargaining relationships between [employers and employees] but instead to provide an efficient means of insuring employment security in the State." Id. at 533, 99 S.Ct. at 1337. After examining the legislative history of the Social Security Act, the Court concluded, and the court here purportedly recognizes, that "Congress intended the several States to have broad freedom in setting up the types of unemployment compensation that they wish." Id. at 537, 99 S.Ct. at 1339. Thus, despite the fact that the New York statute altered the relative positions of parties in a labor dispute, the Court concluded:
 
 
 64
 In all events, a State's power to fashion its own policy concerning the payment of unemployment compensation is not to be denied on the basis of speculation about the unexpressed intent of Congress. * * * In an area in which Congress has decided to tolerate a substantial measure of diversity, the fact that the implementation of this general state policy affects the relative strength of the antagonists in a bargaining dispute is not a sufficient reason for concluding that Congress intended to pre-empt that exercise of state power.
 
 
 65
 Id. at 545-46, 99 S.Ct. at 1344 (emphasis added).
 
 
 66
 Similarly, in Ohio Bureau of Employment Services v. Hodory, 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977), the Supreme Court upheld a state statute disallowing unemployment benefits if a worker's unemployment was "due to a labor dispute other than a lockout at any factory * * * owned or operated by the employer by which he is or was last employed." In holding essentially that the state could validly treat strikers less favorably than those who were unemployed for other reasons, the Court stated:
 
 
 67
 [The worker's] position is contrary to the principle that "the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy."
 
 
 68
 * * *
 
 
 69
 * * *
 
 
 70
 Looking only at the face of the statute, an acceptable rationale immediately appears. The disqualification is triggered by "a labor dispute other than a lockout." In other words, if a union goes on strike, the employer's contributions are not increased, but if the employer locks employees out, all his employees thus put out of work are compensated and the employer's contributions accordingly are increased. Although one might say that this system provides only "rough justice," its treatment of the employer is far from irrational. "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' " * * * [T]he fact that appellee happened to be a member of a union (other than the striking union ) is not a legitimate reason, standing alone, to deny him benefits.
 
 
 71
 Hodory, 431 U.S. at 490-91, 97 S.Ct. at 1909 (emphasis added; citations omitted).
 
 
 72
 The Court then quoted with approval the district court, which stated:
 
 
 73
 Moreover, close scrutiny of the reasons for the State's classification reveals that what the state is actually intending to prevent is not the "subsidizing" of unemployed union members per se, but the subsidizing of union-initiated work stoppages.
 
 
 74
 Hodory, 408 F.Supp. at 1022 (emphasis in original).
 
 
 75
 The Supreme Court recently reaffirmed the state's power to set its own unemployment compensation standards in Baker v. General Motors Corp., --- U.S. ----, 106 S.Ct. 3129, 92 L.Ed.2d 504 (1986), where it upheld a statute denying unemployment compensation to persons providing "financing" for a labor dispute--union members--against another preemption challenge. In focusing on the history of the Social Security Act, the Court stated:
 
 
 76
 The policy of allowing "broad freedom to set up the type of unemployment compensation they wish" has been a basic theme of the program since the general outlines of the legislation were first identified in the Report of the Committee on Economic Security that was prepared for "the President of the United States and became the cornerstone of the Social Security Act." Ohio Bureau of Employment Services v. Hodory, 431 U.S. 471, 482 [97 S.Ct. 1898, 1905, 52 L.Ed.2d 513] (1977). In guiding state efforts to draft unemployment compensation programs, however, that Report also stressed the importance of the distinction between voluntary and involuntary unemployment. It characterized that distinction as "the key to eligibility." Id., at 483 [97 S.Ct. at 1905]. "To serve its purposes, unemployment compensation must be paid only to workers involuntarily unemployed." Id., at 482 [97 S.Ct. at 1905] (quoting Report of the Committee on Economic Security, as reprinted in Hearings on S. 1130 before the Senate Committee on Finance, 74th Cong., 1st Sess., 1311, 1328 (1935)).
 
 
 77
 The involuntary character of the unemployment is thus generally a necessary condition to eligibility for compensation. But even involuntary unemployment is not always a sufficient condition to qualify for benefits, as we found in Hodory. In that case, we held that Ohio could disqualify a millwright who was furloughed when the plant where he worked was shut down because of a shortage of fuel caused by a strike at coal mines owned by his employer. Even though he was unemployed through no fault of his own, as the result of a labor dispute in which he had no interest, federal law did not require Ohio to pay him unemployment compensation.
 
 
 78
 Id. at 3136-37 (emphasis added in part).
 
 
 79
 Thus, the Supreme Court clearly dictates that states must have "broad freedom" in setting their own unemployment compensation standards, and also makes clear that involuntary unemployment is the key to eligibility for unemployment compensation benefits. The court here, however, merely pays lip service to these directives. See Op. at 928. Furthermore, just as in this case, the Michigan law before the Supreme Court in Baker was applied in such a way to distinguish between voluntary and involuntary unemployment. Nevertheless, the Court stated that the employer did nothing to impair the exercise of the appellants' section 7 rights:
 
 
 80
 To the extent that appellants may be viewed as participants in the decision to strike, or to expend funds in support of the local strikes, it is difficult to see how such a decision would be entitled to any greater protection than is afforded to actual strikers. In either event, the fact that the temporary unemployment is entirely attributable to the voluntary use of the union's bargaining resources--untainted by any unlawful conduct by the employer--is a sufficient reason for allowing the State to decide whether or not to pay unemployment benefits.
 
 
 81
 * * *
 
 
 82
 * * *
 
 
 83
 Appellants were not laid off simply because they paid emergency dues. Rather, * * * they became unemployed because there was a meaningful connection between the decision to pay the emergency dues, the strikes which ensued, and ultimately their own layoffs. * * * As the [Michigan Supreme Court] put it, "since the Michigan law only disqualifies those who are directly involved in the labor dispute through financing, the MESA essentially only disqualifies 'strikers.' " * * * [F]ederal law does not prohibit the States from deciding whether or not to compensate the employees who thereby cause their own unemployment.
 
 
 84
 * * *
 
 
 85
 * * *
 
 
 86
 [A]n employee's decision to participate in a strike, either directly or by financing it, is not only an obvious example of causing one's own unemployment--it is one that furthers the federal policy of free collective bargaining * * *.
 
 
 87
 Id. at 3138-39 (emphasis added; citations omitted).
 
 
 88
 Similarly, in the case before us, the union members became temporarily unemployed because their voluntary action caused a strike.[6] Simply put, the Supreme Court says in Baker that as long as the employer has not engaged in any unfair labor practice, a state may grant or deny unemployment benefits under its statute without any threat of preemption by the NLRA, where it bases its determination on the voluntary/involuntary nature of the unemployment. Moreover, both New York Telephone and Baker state that this will be true even in those situations, as here, where application of the statute has the unintended effect of possibly altering the relative strengths of union/non-union workers. The Court makes clear that this effect does not invalidate a statute as preempted by the NLRA, but rather must be tolerated in light of the policies underlying the Social Security Act.
 
 
 89
 The court here, despite a clear record and unambiguous Supreme Court guidance, failed to respect South Dakota's proper application of the voluntary/involuntary standard in determining which Homestake employees were eligible for benefits. This, in my view, was the court's first and most fundamental error.
 
 
 90
 II. THE COURT IGNORES BASIC PRINCIPLES OF LABOR LAW.
 
 
 91
 The court's second error arises from its first. Having wrongly determined that the state awarded benefits based on a union member/non-member distinction, the court compounds its flawed analysis by concluding that the state applied its "availability" standard in an impermissible fashion. Op. at 929. The court explicitly assumes that if the standard had been applied properly, some union members may have been eligible for benefits because they expressed a desire to work and were thus "available." Id.
 
 
 92
 This conclusion, however, collides with the basic principle of labor law that when a worker elects to join a union, that worker has consciously decided to allow that union to represent him and has agreed to be bound by the union's decisions on his behalf. What the court appears to suggest is that those union members who either voted against the strike or later wished to resign from the union were not bound by the union decision to strike, but were free to disregard this union stance at any given time. This proposition, however, goes against the very nature of the union relationship with its members. As the Supreme Court stated in NLRB v. Allis-Chalmers Manufacturing Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967):
 
 
 93
 National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions. The policy therefore extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees. "Congress has seen fit to clothe the bargaining representative with powers comparable to those possessed by a legislative body both to create and restrict the rights of those whom it represents * * *." Thus only the union may contract the employee's terms and conditions of employment, and provisions for processing his grievances; the union may even bargain away his right to strike during the contract term, and his right to refuse to cross a lawful picket line. The employee may disagree with many of the union decisions but is bound by them. "The majority-rule concept is today unquestionably at the center of our federal labor policy." "The complete satisfaction of all who are represented is hardly to be expected. A wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion."
 
 
 94
 Allis-Chalmers, 388 U.S. at 180, 87 S.Ct. at 2006 (emphasis added; footnotes and citations omitted).
 
 
 95
 The principle that a union member is bound by the union's decision was reaffirmed in Scofield v. NLRB, 394 U.S. 423, 435, 89 S.Ct. 1154, 1160-61, 22 L.Ed.2d 385 (1969), where the Court stated:
 
 
 96
 In dealing with the employer as bargaining agent, the union has accorded all employees uniform treatment. If members are prevented from taking advantage of their contractual rights bargained for all employees it is because they have chosen to become and remain union members.
 
 
 97
 * * *
 
 
 98
 * * *
 
 
 99
 That the choice to remain a member results in differences between union members and other employees raises no serious issue * * * because the union has not induced the employer to discriminate against the member but has merely forbidden the member to take advantage of benefits which the employer stands willing to confer.
 
 
 100
 Most recently, in Baker, the Supreme Court quoted with approval the statement of the Michigan Supreme Court in Baker v. General Motors Corp., 420 Mich. 463, 363 N.W.2d 602, 618-19 (1984):
 
 
 101
 UAW membership is required for employment by GM because the UAW bargains for such a provision in its contract with GM. In so doing, the UAW represents its members and they must ratify any contract agreed upon by the UAW and GM. Therefore, any "coercion" resulting from the terms of the contract does not make the plaintiffs' action in accord with the contract "involuntary." As the Court of Appeals said in Applegate v. Palladium Publishing Co., 95 Mich.App. 299, 305; 290 N.W.2d 128 (1980), and we adopt here: "Action taken by employees under a contract negotiated for them by their authorized agent must be considered their voluntary acts. In effect, plaintiff agreed to [act] pursuant to the collective bargaining agreement."
 
 
 102
 Any other holding would make all actions taken by union members pursuant to a union contract involuntary and relieve the members of responsibility for their contract-based actions. We cannot agree with such a rule.
 
 
 103
 Baker, 106 S.Ct. at 3134 n. 18.
 
 
 104
 I view these cases, and especially Baker, as controlling on this issue. In Baker, the financing that the Court viewed as tantamount to participation in the strike was a special dues increase for a strike insurance fund. The Baker appellants, unemployed workers, argued that the dues payments were involuntary because payment of the dues was required by the UAW in order for employees to retain their union membership. The Court, however, stated that "employees could not use their own collective-bargaining agent as a shield to protect them from responsibility for conduct that they had authorized." Id. at 3134.
 
 
 105
 The same rationale is applicable here. Although there is no special "strike fund" at issue, nonetheless, by joining the union and paying union dues, the union members became bound by the union contract. The members anticipate and expect that the union, acting on their behalf, may call a strike. These employees may not reap the benefits of union membership, then disassociate themselves from the union when they disagree with a specific instance of implementation of union policy, particularly in this instance, where union rules mandate solidarity during a strike.
 
 
 106
 Under Article XVI of the Constitution of the International Union of United Steelworkers of America (Constitution), strikes are prohibited without the approval of the International President. The International Union is the contracting party in all collective bargaining agreements and each collective bargaining agreement is to be signed by the International Officers. Article XVII, Sec. 3, of the Constitution provides:
 
 
 107
 The International Union and the Local Union to which the member belongs shall act exclusively as the members' agent to represent the member in the presentation, maintenance, adjustment, and settlement of all grievances and other matters relating to terms and conditions of employment or arising out of the employer-employee relationship.
 
 
 108
 Under the Constitution, members are required to take the following oath:
 
 
 109
 I do sincerely promise, of my own free will, to abide by the laws of this Union; to bear true allegiance to, and keep inviolate the principles of the United Steelworkers of America * * *; and, as the workers of the entire country are competitors in the labor world, I promise to cease work at any time I am called upon by the organization to do so. And I further promise to help and assist all members in adversity, and to have all workers join our Union that we may all be able to enjoy the fruits of our labor * * *.
 
 
 110
 Constitution Manual, at 103-04 (emphasis added).
 
 
 111
 Under the By-Laws for Local Unions (By-Laws), the duty of the president of the local union is as follows:
 
 
 112
 The President shall enforce the provisions of the International Constitution and of these By-Laws and the policies and Manuals of the International Union * * *.
 
 
 113
 By-Laws, Article V, Sec. 1(c).
 
 The By-Laws further provide:
 
 114
 Any member may be penalized for committing any one or more of the following offenses: (a) violation of any of the provisions of the International Constitution or of these By-Laws, any collective bargaining agreement, or rule of the Local Union; * * * (d) advocating or attempting to bring about the withdrawal from the International Union of any Local Union or any member or group of members; * * * (m) deliberately engaging in conduct in violation of the responsibility of members toward the organization as an institution * * *.
 
 
 115
 By-Laws, Article IX, Secs. 1(a)(d)(m).
 
 
 116
 It is also worth noting that Gordon Renner, Staff Representative of the United Steelworkers of America, testified in a deposition as follows:
 
 
 117
 Q. When the decision was made to go on strike, was that a decision made by the members of this Local?
 
 
 118
 A. Yes.
 
 
 119
 Q. And not a decision made by anybody else, it was a vote locally here?
 
 
 120
 A. Vote locally.
 
 
 121
 Deposition of G. Renner, June 26, 1984 (emphasis added).
 
 
 122
 In this case the union decided to strike, based on a majority vote of its members, before Homestake took any action prohibiting employees from working. There is thus no question that those union members who voted in favor of the strike were voluntarily unemployed. What the court's opinion ignores, however, is that by virtue of their contract relationship with the union, even those union members who voted against the strike or wished to subsequently resign from the union had acquiesced in the majority decision of the union and were therefore on strike, as well as and by definition voluntarily unemployed. The union Constitution and By-Laws clearly prohibited dissension from a strike. The South Dakota referee and the South Dakota Secretary of Labor both recognized the binding effect of the union decision on its members and accordingly based their decisions upon it. The court, however, fails to take into account that the union in this case spoke for all its members. As the court sees it:
 
 
 123
 The referee made no attempt to identify or distinguish those union employees who were willing to work despite the strike from those union employees who were unwilling to work because of the strike. * * * [T]he referee made no inquiry and treated as irrelevant any consideration of whether individual union claimants were available to work despite the position taken by the Union as a whole.
 
 
 124
 Op. at 926.
 
 
 125
 I believe the legally correct view, however, is simply stated by Judge Bogue: "Nonmembers have not decided to join a union, have not had the opportunity to vote on a strike, and have not agreed to be bound by the decision of the union to go on strike." United Steelworkers of America v. Block, 578 F.Supp. 1417, 1422 (1982) (emphasis added).
 
 
 126
 I believe the court's position in this regard not only contravenes the well-settled principle that the union, as the representative of union members, speaks for those members, but also suggests that union members are free to disregard a union stance taken on their behalf. As the Scofield Court pointed out, 394 U.S. at 430, 89 S.Ct. at 1158, a union is "free to enforce a properly adopted rule which reflects a legitimate union interest, impairs no policy Congress has imbedded in the labor laws, and is reasonably enforced against union members who are free to leave the union and escape the rule." The panel, however, seems to be suggesting that union members may remain in the union while flouting union policy. I cannot agree with such a result.III. CONCLUSION.
 
 
 127
 In sum, I believe that the court, by failing to carefully examine and analyze the record, the relevant Supreme Court decisions, the intricacies of labor relations, and the practicalities of the instant situation reaches a decision erroneous as a matter of fact and law. A proper analysis shows that the state applied a neutral, non-discriminatory, involuntary/voluntary standard in awarding or denying unemployment benefits to Homestake employees, a standard that clearly comports with the Supreme Court's teachings. Accordingly, I believe that the court was incorrect in affirming the original panel and district court decisions. For the foregoing reasons, I dissent.
 
 
 
 *
 The HONORABLE DONALD R. ROSS assumed senior status on June 13, 1987
 
 
 [1]
 This conclusion was also reached by the original panel of this court on appeal and the district court
 
 
 [2]
 The court here states only that "[t]he South Dakota Secretary of Labor affirmed [the referee's rulings] on appeal, again relying on Section 61-6-19(3)." Op. at 926. The original panel's decision made no specific reference to the Secretary's ruling or analysis. The district court stated only that "[d]efendant, in her capacity as the Secretary of the state Department of Labor, affirmed [the referee's] decisions." United Steel Workers of America v. Meierhenry, 608 F.Supp. 201, 203 (D.S.D.1985)
 
 
 [3]
 In deciding this issue, John Bender, the Chief Appeals Referee, held a full hearing with testimony taken under oath and issued a decision incorporating findings of fact and conclusions of law
 
 
 [4]
 Judith Meierhenry, Secretary of the South Dakota Department of Labor, was a lawyer who had practiced in South Dakota. One of her main interests was administrative law, and she had been heavily involved in unemployment insurance legislation before the legislature. Her position was a cabinet-level position and she was responsible for setting policy and administering the Department's programs. In reviewing the appeal from the Appeals Referee, in addition to herself being a lawyer versed in unemployment compensation matters, she had a lawyer assigned to her from the Attorney General's office who conducted extensive review of Chief Appeal Referee Bender's hearing and decision
 
 
 [5]
 The decision in Block turned on the conclusion that the union plaintiffs had no standing to challenge the USDA's denial of food stamps. The Secretary was not relying on Block for its precedential authority, however. The Secretary was using the language of Block in explaining that South Dakota was not granting or denying unemployment benefits based on whether or not an employee was a member of the union
 
 
 [6]
 Further, as in Baker, there is no allegation here that the employer engaged in any unfair labor practice, thus distinguishing both Baker and this case from cases like Nash v. Florida Industrial Comm'n, 389 U.S. 235, 88 S.Ct. at 362, 19 L.Ed.2d 438 (1967), where the result turned on an employee's being punished for exercising her rights. See Baker, 106 S.Ct. at 3138